**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

**TAMPA DIVISION**

Robert Thompson, individually and on behalf
of all others similarly situated,

                         Plaintiff,

         - against -                         Class Action Complaint

Walmart Inc.,

                 Defendant            Jury Trial Demanded

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff,

which are based on personal knowledge:

1.      Walmart Inc. ("Defendant") manufactures peach flavored water or beverage

enhancers which purports to get its peach taste only from natural flavoring ingredients under its

Great Value brand ("Product").



## I.    CONSUMER AVOIDANCE OF ARTIFICAL FLAVORS

2.    Consumers are increasingly concerned about the ingredients in what they eat and drink.

3.    According to the Wall Street Journal, "As consumer concern rises over artificial ingredients, more food companies are reconstructing recipes" to remove artificial flavors.[1]

4.    According to Paul Manning, chief executive officer and president of Sensient Technologies, "Consumer desire for naturally flavored products is an emerging trend."[2]

5.    According to Consumers Union, over 80% of consumers expect that the word "natural," in almost any context, on a food label means that a food does not contain any artificial ingredients.

6.    Explanations for why consumers prefer foods containing natural, instead of artificial ingredients, are varied.

7.    Many Americans believe products are healthier when artificial ingredients are removed, even in "unhealthy" categories such as snacks, cake mix, and frozen pizza.

8.    A recent survey reported that over 82% of US respondents believe that foods with artificial flavors are less healthy than those promoted as containing natural flavors and/or not containing artificial flavors.

9.    Consumers seek to avoid artificial flavors because they are weary of ingredients which are highly processed with chemical additives and synthetic solvents in laboratories.

10.    According to Nielsen, the absence of artificial flavors is very important for over 40%

---

[1] Lauren Manning, How Big Food Is Using Natural Flavors to Win Consumer Favor, Wall Street Journal.

[2] Keith Nunes, Using natural ingredients to create authentic, fresh flavors, Food Business News, Sept. 20, 2018.

of respondents to their Global Health & Wellness Survey.

11.    One scholar theorized "the preference for natural products appeals to a moral ideology and offers a moral satisfaction."[3]

12.    The trade journal, Perfumer & Flavorist, described "The Future of Artificial Flavors & Ingredients" as bleak, given consumer opposition to these synthetic ingredients.[4]

13.    Mintel announced that consumer avoidance of artificial flavors is just as strong as their desire for natural flavors, in its Report, "Artificial: Public Enemy No. 1."[5]

14.    About half of Americans say they seek out natural flavors at least some of the time.

15.    In contrast, artificial flavors were sought out by only about one in 10 consumers, with approximately half saying they avoid each of them at least some of the time.

16.    Nielsen reported that 62% of consumers try to avoid artificial flavors.

17.    New Hope Network concluded that 71% of consumers avoid artificial flavors.

18.    Label Insight determined that 76% of consumers avoid artificial flavors.

19.    A recent survey shows more than three in four people worldwide are convinced that artificial flavors have no place on their ingredient lists.[6]

20.    According to Forbes, 88% of consumers consider foods without artificial flavors to be more natural and healthier than foods with artificial flavors, and would pay more for such foods.

---

[3] Rozin, P., Spranca, M., Krieger, Z., Neuhaus, R., Surillo, D., Swerdlin, A., & Wood, K. (2004). Preference for natural: Instrumental and ideational/moral motivations, and the contrast between foods and medicines. Appetite, 43(2), 147–154. doi:10.1016/j.appet.2004.03.005.
[4] Jim Kavanaugh, The Future of Artificial Flavors & Ingredients, Perfumer & Flavorist, June 12, 2017.
[5] Alex Smolokoff, Natural color and flavor trends in food and beverage, Natural Products Insider, Oct. 11, 2019; Thea Bourianne, Exploring today's top ingredient trends and how they fit into our health-conscious world, March 26-28, 2018; Nancy Gagliardi, Consumers Want Healthy Foods – And Will Pay More For Them, Forbes, Feb 18, 2015.
[6] What 'Natural' Really Means to Consumers GNT Group's Guide to Global Consumer Demands attests importance of natural colors for future-proof products, July 13, 2017.

## II.   INCREASE IN CONSUMPTION OF WATER ENHANCERS

21.   According to Mordor Intelligence's US Water Enhancer Market Analysis, the market for water enhancers, defined as non-caloric flavored liquid concentrates, is increasing at close to ten percent a year.[7]

22.   Several reasons are behind this explosive growth.

23.   First, rising levels of obesity has made the population more reluctant to consume sugary drinks, whether fruit juices or carbonated soft drinks ("CSD").

24.   Second, in place of these calorie-laden drinks, public health officials and the media have emphasized substituting water, a non-caloric and healthier alternative.

25.   However, "many consumers want more from their water" because of its naturally "plain" taste compared to the flavor of the sodas and fruit juices they are giving up.[8]

26.   Increasing consumer avoidance of artificial flavoring ingredients has made companies focus on delivering authentic and intense taste experiences while using only natural flavoring ingredients.

## III.   FLAVOR SOURCE REQUIRED TO BE DISCLOSED

27.   Research shows that "consumers initially [] rely on extrinsic cues such as visual information on labels and packaging to evaluate [any] product," thereby "develop[ing] sensory

---

[7] Mordor Intelligence, United States Water Enhancer Market – Growth, Trends, Covid-19 Impact, And Forecasts (2023 – 2028)
[8] Isaac Fletcher, Water is Getting a New Image (And Taste) From Enhancers, Food Online, May 21, 2014.

expectations" about attributes such as its taste and the source of that taste.[9]

28.    The Food and Drug Administration ("FDA") was aware of the importance of disclosing the source of a food or beverage's flavor to consumers when it acted at the direction of Congress to establish consistent rules to facilitate consumer choice and prevent deception.[10]

29.    First, it defined a flavor as a substance whose function is to impart taste. 21 C.F.R. § 101.22(a)(1) and (3).

30.    Second, it required that that whenever "[a] label, labeling, or advertising of a food makes any direct or indirect representations with respect to [a] primary recognizable flavor(s), by word, vignette, e.g., depiction of a fruit, or other means," it is considered its "characterizing flavor," and its source must be disclosed to consumers. 21 C.F.R. § 101.22(i)(1).

31.    According to one scholar, this rule "is premised on the simple notion that consumers value 'the real thing' versus a close substitute and should be able to rely on the label to readily distinguish between the two."[11]

32.    The FDA defined natural flavor as referring to the "essential oil, oleoresin, essence or extractive" from fruits or vegetables, "whose significant function [] is flavoring rather than nutritional." 21 C.F.R § 101.22(a)(3).

33.    Artificial flavor was defined as "any substance, the function of which is to impart

---

[9] Lancelot Miltgen, Caroline, Gaëlle Pantin Sohier, and Bianca Grohmann. "Communicating sensory attributes and innovation through food product labeling." Journal of food products marketing 22.2 (2016): 219-239; Blackmore, Helena, Claire Hidrio, and Martin R. Yeomans. "A taste of things to come: The effect of extrinsic and intrinsic cues on perceived properties of beer mediated by expectations." Food Quality and Preference 94 (2021): 104326; Okamoto, Masako, and Ippeita Dan. "Extrinsic information influences taste and flavor perception: A review from psychological and neuroimaging perspectives." Seminars in cell & developmental biology. Vol. 24. No. 3. Academic Press, 2013.
[10] This State adopted these identical federal regulations.
[11] Steven Steinborn, Hogan & Hartson LLP, Regulations: Making Taste Claims, PreparedFoods.com, August 11, 2006.

flavor" from sources other than fruits or vegetables. 21 C.F.R § 101.22(a)(1).

## IV.   FLAVOR PROPERTIES OF PEACHES

34.    Peach [*Prunus persica L.*] is a perennial drupe or "stone fruit," with a hard core (pit) is surrounded by an outer, fleshy pulp, widely cultivated in temperate regions.[12]

35.    The peach is increasingly popular among consumers based on its visual appeal, nutrition, and distinct flavor characteristics.[13]

36.    Taste is a combination of sensations arising from specialized receptor cells in the mouth.

37.    Taste is defined as sensations of sweet, sour, salty, bitter, and umami.

38.    Taste is complex, because, for instance, the taste of sour includes the sourness of vinegar (acetic acid), sour milk (lactic acid), lemons (citric acid), apples (malic acid), and wines (tartaric acid).

39.    Each of those acids is responsible for unique sensory characteristics of sourness.

40.    The taste of fruits such as peaches depend on (1) the interaction between the relative amounts of sugars and organic acids and (2) volatile compounds.[14]

41.    According to Hans-Juergen Sachs, General Manager for global flavor house Sensient Flavors, "Peach is a consistent consumer favorite and ranks in the top ten most popular flavors across fruit juices, flavored waters and ice teas" based on liking for its "taste profile with balanced sweetness and acidity."[15]

---

[12] Baccichet, Irina, et al. "Characterization of fruit quality traits for organic acids content and profile in a large peach germplasm collection." Scientia Horticulturae 278 (2021): 109865.

[13] Wu, Huimin, et al. "Physicochemical Characteristics, Antioxidant Activities, and Aroma Compound Analysis of Seven Peach Cultivars (Prunus persica L. Batsch) in Shihezi, Xinjiang." Foods 11.19 (2022): 2944.

[14] Y.H. Hui, et al., Handbook of Fruit and Vegetable Flavors, p. 693 (2010).

[15] Sensient Flavors Introduces New Natural Peach Flavors, Food Ingredients First, Aug. 6, 2014.

42.    The four key free sugars in peaches are sucrose, glucose, sorbitol and fructose.

43.    The four key organic acids in peaches are malic acid, quinic acid, succinic acid and citric acid, shown in the table below.

| Fruit | First Predominant Acids | Second Predominant Acids |
|---|---|---|
| Apple | Malic Acid (95%) | Tartaric Acid, Fumaric Acid |
| Apricot | Malic Acid (70%) | Citric Acid, Tartaric Acid |
| Blackberry | Citric Acid | Malic Acid |
| Blueberry | Citric Acid | Malic Acid, Quinic Acid |
| Cherry | Malic Acid (94%) | Tartaric Acid |
| Cherry (Tropical) | Malic Acid (32%) | Citric Acid |
| Chili Peppers | Citric Acid | Malic Acid, Succinic Acid |
| Coconut | Malic Acid | Citric Acid |
| Dragon fruit | Malic Acid | Citric Acid |
| Grape | Malic Acid (60%) | Tartaric Acid |
| Grapefruit | Citric Acid | Malic Acid |
| Guava | Citric Acid | Malic Acid |
| Kiwi | Quinic Acid, Citric Acid | Malic Acid |
| Lemon | Citric Acid | Malic Acid |
| Lime | Citric Acid | Malic Acid |
| Mango | Citric Acid | Malic Acid, Tartaric Acid |
| Orange | Citric Acid | Malic Acid |
| Peach | Malic Acid (73%) | Quinic Acid, Succinic Acid, Citric Acid |
| Pear | Malic Acid (77%) | Citric Acid |
| Pineapple | Citric Acid | Malic Acid |
| Pomegranate | Malic Acid (>50%) | Citric Acid (>22%) |
| Raspberry | Citric Acid | Malic Acid, Tartaric Acid |
| Strawberry | Citric Acid | Malic Acid, Tartaric Acid |
| Tamarind | Tartaric Acid | Citric Acid, Malic Acid |
| Watermelon | Malic Acid (99%) | Fumaric Acid |

44.    Sweetness and sourness are the prominent eating quality attributes in peaches.

45.    The sweetness of peaches is influenced by citric acid and sugar to organic acids ratio,

7

while aroma correlates with total acidity and malic acid content.

46.    The proportion of malic acid to the secondary acids is a critical factor in producing the preferred peach taste.[16]

47.    Malic acid provides a tart and tangy taste to balance the sweetness from the peaches' free sugars.

48.    According to scholars of plant biology, "Compared to citric acid, malic acid has a much [more] apparent acidic taste, and it also tastes better than citric acid does," contributing to the peach aroma.[17]

## V.    LABEL OMITS ADDED ARTIFICIAL FLAVORING

49.    The Product's primary or "characterizing" flavor is "peach," because the label makes "direct [] representations" about this fruit through the word "Peach" and pictures of two ripe peach wedges. 21 C.F.R. § 101.22(i).

50.    By identifying the Product's peach flavor as coming from "Natural Flavor With Other Natural Flavors," consumers will understand its peach taste is only from natural flavoring ingredients. 21 C.F.R. § 101.22(i)(1)(iii) (describing natural flavor with other natural flavors where some of the taste is provided by the characterizing ingredient, i.e., peach and enhanced and simulated with flavors from other natural sources).

51.    While the ingredient list in small print on the back lists "Natural Flavor" as the fifth most predominant ingredient by weight, this is less than "Malic Acid," listed third.

---

[16] Jiang, X., Liu, K., Peng, H. et al. Comparative network analysis reveals the dynamics of organic acid diversity during fruit ripening in peach (Prunus persica L. Batsch). BMC Plant Biol 23, 16 (2023).

[17] Colaric, Mateja, et al. "Evaluation of peach and nectarine fruit quality and correlations between sensory and chemical attributes." Journal of the Science of Food and Agriculture 85.15 (2005): 2611-2616.



INGREDIENTS WATER, PROPYLENE GLYCOL, MALIC ACID, CONTAINS 2% OR LESS OF: SUCRALOSE, NATURAL FLAVOR, ACESULFAME POTASSIUM, CITRIC ACID, YELLOW #5, RED #40, NIACINAMIDE (VITAMIN B3), POTASSIUM SORBATE (PRESERVATIVE), PYRODOXINE HYDROCHLORIDE (VITAMIN B6), BLUE #1, SODIUM BENZOATE (PRESERVATIVE), CYANOCOBALAMINE (VITAMIN B12).

52.     Even if a consumer reviewed the fine print ingredient list on the back label, they would not know which version of "Malic Acid" the Product uses.

53.     This is because malic acid has two isomers, or arrangements of atoms, L-Malic Acid and D-Malic Acid, which are similar to right and left-hand versions of the same molecular formula.[18] 21 C.F.R. § 184.1069.



54.     While L-Malic Acid occurs naturally in fruits like peaches, D-Malic Acid is most

---

[18] Dan Chong and Jonathan Mooney, Chirality and Stereoisomers (2019).

commonly found as a racemic mixture of the D and L isomers, or DL-Malic Acid.

55.   DL-Malic Acid is not found in peaches or any other fruit, vegetable or natural source, because it is derived from petroleum.

56.   It is made through a catalytic process with numerous chemical reactions, including heating maleic anhydride with water under extreme pressure at roughly 180°C.

57.   This results in an equilibrium mixture of malic and fumaric acids.

58.   The soluble fumaric acid is filtered off and recycled, and the synthetic, or DL-, malic acid is concentrated and crystallized.

59.   Laboratory testing with chiral high-performance liquid chromatography ("HPLC") and/or enzymatic methods with D-malate dehydrogenase (D-MDH) concluded the Product contains DL-Malic Acid, the synthetic version of this essential component in providing a peach's sweet, tart and tangy taste.

60.   This was because D-Malic acid was preferentially oxidized over L-Malic acid, indicating the presence of the synthetic D-isomer.

61.   Federal and identical state regulations require that because the Product contains DL-Malic Acid that imparts a peach flavor, "Peach" is required to "be accompanied by the word(s) 'artificial' or 'artificially flavored,'" such as "Artificial Peach [Tea] Flavored" or "Artificially Flavored Peach [Tea]." 21 C.F.R. § 101.22(i)(2).

62.   Since the front label omits any reference to artificial flavoring ingredients as being responsible for the Product's peach taste, consumers expecting only natural flavoring ingredients are misled.

63.   While the natural flavor of a peach is heavily dependent on a specific ratio of sugar and other acids, primarily L-Malic Acid, the Product's peach flavor depends upon a ratio of sugar

and DL-Malic Acid.

64.    The Product's peach flavor based on DL-Malic Acid resembles the natural flavors used in the Product, from peaches and other natural sources.

65.    The Product includes DL-Malic Acid to provide the tangy, sweet and tart taste peaches are known for.

66.    In certain instances, the addition of malic acid does not fundamentally alter a food's underlying flavors.

67.    An example would be the addition of malic acid to vinegar (ascetic acid) dishes like barbecue pork, coleslaw, or pickled eggs.

68.    However, because malic acid is a core component of the tangy, sweet and tart taste peaches are known for and imparts a characteristic taste of its own, DL-Malic Acid cannot be said to supplement, enhance or modify the Product's original peach taste. 21 C.F.R. § 170.3(o)(11).

69.    The Product could have added flavoring from peaches or other natural sources, or L-Malic Acid obtained from peaches, but added DL-Malic Acid because it cost less and/or more effectively imparted an original peach taste.

## JURISDICTION AND VENUE

70.    Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

71.    The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

72.    Plaintiff is a citizen of Florida.

73.    Defendant is a citizen of Arkansas and Delaware.

74.    The class of persons Plaintiff seeks to represent includes persons who are citizens of

11

different states from which Defendant is a citizen.

75.     The members of the proposed classes Plaintiff seeks to represent are more than 100, because the Product is sold from Defendant's thousands of physical locations in the States Plaintiff seeks to represent and online.

76.     Venue is in this District with assignment to the Tampa Division because Plaintiff resides in Pinellas County and a substantial part of the events or omissions giving rise to these claims occurred in Pinellas County, including Plaintiff's purchase, consumption and/or use of the Product, and awareness and/or experiences of and with the issues described here.

## PARTIES

77.     Plaintiff Robert Thompson is a citizen of Largo, Pinellas County, Florida.

78.     Defendant Walmart Inc. is a Delaware corporation with a principal place of business in Bentonville, Arkansas, Benton County.

79.     Walmart is an American multinational retail corporation that operates a chain of over 5,000 supercenters throughout the nation, with almost four hundred in Florida alone, selling everything from furniture to electronics to groceries.

80.     While Walmart sells leading national brands of products, it also sells a large number of products under one of its private label brands, Great Value.

81.     Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

82.     Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

83.     Products under the Great Value brand have an industry-wide reputation for quality.

84.     In releasing products under the Great Value brand, Defendant's foremost criteria was

to have high-quality products that were equal to or better than the national brands.

85.   Walmart is able to get national brands to produce its private label items due its loyal customer base and tough negotiating.

86.   Private label products under the Great Value brand benefit by their association with consumers' appreciation for the Walmart brand as a whole.

87.   That Great Value branded products met this high bar was proven by focus groups, which rated them above their name brand equivalent.

88.   A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands [like Great Value] are good alternatives to national brands, and more than 60 percent consider them to be just as good."

89.   Private label products generate higher profits for retailers like Walmart because national brands spend significantly more on marketing, contributing to their higher prices.

90.   The development of private label items is a growth area for Walmart, as they select only top suppliers to develop and produce Great Value products.

91.   Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at Walmart store locations including Walmart at 201 34th St N, St. Petersburg, Florida between June 2020 and May 2023, among other times.

92.   Plaintiff read "Peach [Tea]" and "Natural Flavor With Other Natural Flavor," saw the picture of two ripe peach wedges, and took notice that nowhere on the front label was any reference to the Product's peach taste coming from artificial flavoring.

93.   Plaintiff expected the Product's peach taste was from flavoring obtained from peaches and other natural sources like fruits and vegetables.

94.   Plaintiff is part of the majority of consumers who avoid artificial flavors for the

above-identified reasons related to health, nutrition and the environment.

95.    Plaintiff is part of the growing number of Americans who purchase water enhancers because they want to drink more water and avoid sugary drinks, whether fruit juice or soda, for health reasons.

96.    A key factor in Plaintiff's choosing a water enhancer is its flavor, and specifically that it have only natural flavoring ingredients.

97.    Plaintiff believes, like most Americans, that just as sugary drinks contain unhealthy and unnecessary calories, artificial flavoring ingredients contain unhealthy and potentially harmful substances.

98.    Plaintiff was unaware the Product contained artificial flavoring ingredients to provide its peach taste because this was not disclosed to him on the front label, which is where he would have expected to see this information.

99.    Plaintiff relied on the words, terms coloring, descriptions, layout, packaging, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

100.   Plaintiff bought the Product at or exceeding the above-referenced price.

101.   Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

102.   Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

103.   As a result of the false and misleading representations, the Product is sold at a

premium price, approximately no less than $2.12 for 1.62 oz, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

104.  Plaintiff paid more for the Product than he would have paid had he known the representations were false and misleading, as he would not have bought it or paid less.

105.  Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance its representations are consistent with its composition.

106.  Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar water enhancers which fail to disclose the source of their key or main flavoring, because he is unsure whether those representations are truthful.

107.  If Defendant's labeling were to be truthful, Plaintiff could adequately rely on the labeling of other water enhancers that did not disclose added artificial flavoring ingredients were part of their key flavor, because he could then rely on what he was being told.

## CLASS ALLEGATIONS

108.  Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Florida Class:** All persons in the State of Florida who purchased the Product during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Alaska, Wyoming, Montana, New Mexico, Mississippi, Utah, Nebraska, Louisiana, and West Virginia who purchased the Product during the statutes of limitations for each cause of action alleged.

109.  Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

110. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

111. Plaintiff is an adequate representative because his interests do not conflict with other members.

112. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

113. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

114. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

115. Plaintiff seeks class-wide injunctive relief because the practices continue.

## CAUSES OF ACTION

### COUNT I

### Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.* (Florida Class)

116. Plaintiff incorporates by reference preceding paragraphs 1-115.

117. Plaintiff brings this claim on his own behalf and on behalf of each member of the Florida Class.

118. Defendant violated and continues to violate Florida's Deceptive and Unfair Trade Practices Act by engaging in unfair methods of competition, unconscionable acts and practices, and unfair and deceptive acts and practices in the conduct of its business.

119. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions, that its peach taste was from natural flavoring ingredients when it was

16

also from the artificial flavoring ingredient of DL-Malic Acid.

120.   The material misstatements and omissions alleged herein constitute deceptive and unfair trade practices, in that they were intended to and did deceive Plaintiff and the general public into believing that the Product's peach taste was from natural flavoring ingredients when it was also from the artificial flavoring ingredient of DL-Malic Acid.

121.   Plaintiff and class members relied upon these representations about the Product's natural flavoring ingredients and omissions of artificial flavoring ingredients to provide its peach taste in deciding to purchase the Product.

122.   Plaintiff's reliance was reasonable because of Defendant's reputation as a trusted and reliable company, known for its high-quality products, honestly marketed to consumers.

123.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

124.   Defendant's conduct offends established public policy and is immoral, unethical, oppressive, and unscrupulous to consumers.

125.   Plaintiff and class members are entitled to damages in an amount to be proven at trial.

126.   Defendant should also be ordered to cease its deceptive advertising and should be made to engage in a corrective advertising campaign to inform consumers that the Product does contain artificial flavoring ingredients.

## COUNT II

### Violation of State Consumer Fraud Acts
### (Consumer Fraud Multi-State Class)

127.   Plaintiff incorporates by reference preceding paragraphs 1-89.

128.   The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are

similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

129.   The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statutes invoked by Plaintiff.

130.   Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

## COUNT III

### False and Misleading Adverting,
### Fla. Stat. § 817.41

131.   Plaintiff incorporates by reference preceding paragraphs 1-93.

132.   Plaintiff brings this claim on his own behalf and on behalf of each member of the Florida Class.

133.   Defendant made misrepresentations and omissions of material fact, that the Product's peach taste was only from natural flavoring ingredients and not added artificial flavoring, through its advertisements and marketing, through various forms of media, product descriptions, and targeted digital advertising.

134.   Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

135.   Defendant knew that these statements were false.

136.   Defendant intended for consumers to rely on its false statements for the purpose of selling the Product.

137.   Plaintiff and class members did in fact rely upon these statements.

138.   Reliance was reasonable and justified because of Defendant's reputation as a trusted

and reliable company, known for its high-quality products, honestly marketed to consumers.

139.   As a result of Defendant's misrepresentations, Plaintiff and class members suffered damages in the amount paid for the Product.

140.   Plaintiff and class members are entitled to damages and injunctive relief as set forth above.

## COUNT IV

### Breaches of Express Warranty,
### Implied Warranty of Merchantability/Fitness for a Particular Purpose and
### Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

141.   Plaintiff incorporates by reference preceding paragraphs 1-103.

142.   The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that its peach taste was only from natural flavoring ingredients and not added artificial flavoring.

143.   Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and targeted digital advertising.

144.   Defendant knew the product attributes that potential customers like Plaintiff were seeking, such as flavoring only from natural flavoring ingredients and not added artificial flavoring, and developed its marketing and labeling to directly meet those needs and desires.

145.   The representations were conveyed in writing and promised the Product would be defect-free, and Plaintiff understood this meant that its peach taste was only from natural flavoring ingredients and not added artificial flavoring.

146.   Defendant affirmed and promised that the Product's peach taste was only from natural flavoring ingredients and not added artificial flavoring.

147.   Defendant described the Product so Plaintiff and consumers believed its peach taste was only from natural flavoring ingredients and not added artificial flavoring, which became part of the basis of the bargain that it would conform to its affirmations and promises.

148.   Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

149.   This duty is based on Defendant's outsized role in the market for this type of product, custodian of the Great Value brand.

150.   Plaintiff recently became aware of Defendant's breach of the Product's warranties.

151.   Plaintiff provided or provides notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's express and implied warranties associated with the Product.

152.   Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

153.   The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

154.   The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container, or label, because it was marketed as if its peach taste was only from natural flavoring ingredients and not added artificial flavoring.

155.   The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because he expected its peach taste was only from natural flavoring ingredients and not added artificial flavoring, and he relied on

Defendant's skill and judgment to select or furnish such a suitable product.

## COUNT V

### Negligent Misrepresentation

156.   Plaintiff incorporates by reference preceding paragraphs 1-118.

157.   Defendant had a duty to truthfully represent the Product, which it breached.

158.   This duty is based on its position, based on Defendant's position, holding itself out as having special knowledge and experience this area, custodian of the Great Value brand.

159.   These representations and omissions went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first that Defendant has been known for.

160.   These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

161.   The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

162.   Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, his purchase of the Product.

## COUNT VI

### Fraud
### (Fed. R. Civ. P. 9(b) Allegations)

163.   Plaintiff incorporates by reference preceding paragraphs 1-125.

164.   Defendant misrepresented that the Product's peach taste was only from natural flavoring ingredients and not added artificial flavoring, by omitting the required "artificially flavored" disclosure from the front label.

165.   The records Defendant is required to maintain, and/or the information

inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of this falsity and deception, through statements and omissions.

166.   Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

167.   To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity.

168.   WHO: Defendant, Walmart Inc., made material misrepresentations and/or omissions of fact in its advertising and marketing of the Product by representing that the Product's peach taste was only from natural flavoring ingredients and not added artificial flavoring.

169.   WHAT: Defendant's conduct here was and continues to be fraudulent because it has the effect of deceiving consumers into believing that the Product's peach taste was only from natural flavoring ingredients and not added artificial flavoring.

170.   Defendant omitted that the Product contains artificial flavoring ingredients to provide its peach taste.

171.   Defendant knew or should have known this information was material to all reasonable consumers and impacts consumers' purchasing decisions.

172.   Yet, Defendant has and continues to represent that the Product's peach taste was only from natural flavoring ingredients and not added artificial flavoring.

173.   WHEN: Defendant made material misrepresentations and/or omissions detailed herein, including that the Product's peach taste was only from natural flavoring ingredients and not added artificial flavoring, continuously throughout the applicable Class period(s) and through the filing of this Complaint.

174.   WHERE: Defendant's material misrepresentations and omissions, that the Product's peach taste was only from natural flavoring ingredients and not added artificial flavoring, were made in the advertising and marketing of the Product, on the front of the packaging which all consumers buying it inevitably see and take notice of.

175.   HOW: Defendant made written and visual misrepresentations and omissions in the advertising and marketing of the Product, that its peach taste was only from natural flavoring ingredients and not added artificial flavoring.

176.   As such, Defendant's representations are false and misleading.

177.   And as discussed in detail throughout this Complaint, Plaintiff and class members read and relied on Defendant's representations and omissions before purchasing the Product.

178.   WHY: Defendant misrepresented that the Product's peach taste was only from natural flavoring ingredients and not added artificial flavoring for the express purpose of inducing Plaintiff and class members to purchase the Product at a substantial price premium.

179.   As such, Defendant profited by selling the misrepresented Product to thousands of consumers throughout the State of Florida and the Consumer Fraud Multi-State Class.

## COUNT VII

### Unjust Enrichment

180.   Plaintiff incorporates by reference preceding paragraphs 1-143.

181.   Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

### JURY DEMAND AND PRAYER FOR RELIEF

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Awarding monetary, statutory, and/or punitive damages pursuant to applicable laws;

4. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

5. Other and further relief as the Court deems just and proper.

Dated:   May 7, 2023

Respectfully submitted,

 /s/ *William Wright*

The Wright Law Office, P.A.
515 N Flagler Dr Ste P300
West Palm Beach FL 33401
(561) 514-0904
willwright@wrightlawoffice.com

*Lead Counsel for Plaintiff*

Sheehan & Associates, P.C.
Spencer Sheehan*
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com

**Pro Hac Vice* Application Forthcoming